UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x

JAMES HARNAGE,                                    :
                                                  :
                        Plaintiffs,               :
                                                  :
            v.                                    :        3:25-CV-1487 (SFR)
                                                  :
COLLEEN GALLAGHER, *et al.*,                      :
                                                  :
                        Defendants.               :

------------------------------------------------------------- x

## INITIAL REVIEW ORDER

Plaintiff James Harnage, currently incarcerated at MacDougall-Walker Correctional Institution ("MacDougall"), has filed a complaint under 42 U.S.C. § 1983 alleging that MacDougall officials violated his rights under the Constitution, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA").[1] The 43-count Complaint claims damages and injunctive relief from 37 defendants in their individual and official capacities. For the following reasons, Harnage's Eighth Amendment excessive force and conditions of confinement claims, as well as his ADA and RA claims as they relate to the use of black-box restraints and access to a typewriter, may proceed to service against Defendants Decateau, Thomas, Strauskas, Robledo, Griffin, Cage, Demartino, Gallagher, Daugherty, Haye, and Grimaldi. All other claims are dismissed without prejudice and with leave to amend.

---

[1] Harnage also mentions other statutes including 42 U.S.C. §§ 1985 and 1986, Compl. ¶ 1, ECF No. 1, but "mere mention of a statutory violation is not sufficient to state a claim for relief under that statutory provision." *Crispin v. Connecticut*, No. 3:23-CV-1636 (SVN), 2024 WL 3860068, at *14 (D. Conn. Aug. 19, 2024).

## I.    BACKGROUND

### A.    Factual Background

Although I do not set forth all the facts asserted in Harnage's complaint, I will summarize his basic factual allegations here to give context to my ruling below.

Harnage entered the Department of Correction ("DOC") with injuries to his hand, wrist, lower back, and hip, which he sustained during an accident in 1991. Compl. ¶¶ 45-46, ECF No. 1. Harnage has continuously sought treatment for these injuries since entering DOC. *Id.* ¶ 49. Harnage has also complained that the "black-box" restraint system used during transports has gradually worsened the condition of his dominant hand and caused "extreme pain." *Id.* ¶ 50. The black-box restraint system consists of double-locked handcuffs, ankle shackles, a waist chain, a lead chain from the ankles, and a black, "plastic clamshell" over the handcuffs that connects with the waist and lead chains and is secured by a padlock. *Id.* ¶¶ 51-52. The black-box restraint system "draws the inmate[']s wrist inwards and prevents [the inmate] from adjusting the position of the handcuffs." *Id.* ¶ 54. This aspect of the black-box restraint is "most harmful to inmates like Harnage, who[] are obese and have short arms." *Id.* ¶ 57.

Harnage has "informed each of the defendants, both verbally and in writing, that the use of the black-box on him for transport or other purposes[] causes an extreme [e]ffect and degradation of his injury." *Id.* ¶ 61. The black-box restraints "cause[] a worsening of the injury by creating hyperextension[] of the joints at both the base of the thumb and the middle joint of the thumb." *Id.* ¶ 63. As a result, Harnage now experiences "immobility of his dominant hand," which limits his ability to lift and hold a drinking cup or hold and use a writing instrument. *Id.* ¶ 72.

In January 2023, correctional officer Decateau placed Harnage in restraints for return

transport from Federal District Court in Hartford to MacDougall. *Id.* ¶ 79. Harnage told Decateau that the handcuffs were too tight. *Id.* ¶ 80. Decateau responded that he did not want to go back to the facility with loose restraints. *Id.* ¶ 81. Harnage told Decateau of the injuries to his hand and the effects of the black-box restraints on those injuries. *Id.* ¶¶ 82-83. Decateau placed his finger on the inside of Harnage's wrists and told Harnage that "if he could place his finger in the handcuff that it was not too tight." *Id.* ¶ 84. When Decateau added the black-box restraints to the handcuffs, "it created extreme pain and force to Harnage's injury." *Id.* ¶ 87. Decateau refused to loosen the handcuffs despite Harnage's "protestations." *Id.* ¶ 88. As a result, Harnage "suffered another extreme hyperextension of his injury affecting the use of his dominant hand." *Id.* ¶ 94. The Complaint states that a doctor has concluded that surgery will be necessary to "restore function to [Harnage's] hand." *Id.* ¶ 115.

Harnage filed a grievance against Decateau when Harnage returned to the facility. *Id.* ¶ 89. Decateau responded by "making rude and derogatory statements" to Harnage, including calling Harnage a "faggot." *Id.* ¶¶ 90-91. In response to this, Harnage filed other grievances and a Prison Rape Elimination Act complaint against Decateau. *Id.* ¶ 92.

Harnage also submitted "ADA requests," one of which was approved in March 2023 by ADA Coordinator Colleen Gallagher and MacDougall Warden Daniel Daugherty. *Id.* ¶ 73. The approval of Harnage's ADA request resulted in a "custody agreement" providing two accommodations to Harnage: a black-box restraint restriction and access to a typewriter. *Id.* ¶ 74. Prison officials placed an "extra" typewriter in Harnage's housing unit, *id.* ¶ 118, but prison officials did not communicate the black-box restraint restriction to prison staff or make an entry on Harnage's "face sheet" indicating that prison officials were prohibited from using the black-box restraints on Harnage. *Id.* ¶ 75.

### 1.    Transport with Black-Box Restraints

In June 2024, correctional officer Thomas placed Harnage in restraints for a transport to UConn's medical center. *Id.* ¶ 96. Harnage informed Thomas of the custody agreement containing the black-box restraint restriction. *Id.* ¶ 97. Thomas told Harnage that the "face sheet" did not show a black-box restraint restriction or custody agreement. *Id.* ¶ 98.[2] Harnage told two nearby correctional officers—Robledo and Griffin—about the injuries the black-box restraints had caused him previously and asked them to verify the restraint accommodation. *Id.* ¶¶ 99-100. These officers told Harnage that no accommodation was on their clipboards. *Id.* ¶ 101. Harnage insisted the officers call the medical unit to verify the accommodation. *Id.* ¶ 102. After Griffin called Nurse Jennifer in the medical unit, Griffin told Harnage that no restraint accommodations were listed in Harnage's medical records. *Id.* ¶ 103.

Correctional officers insisted that Harnage be transported using black-box restraints. *Id.* ¶ 104. Harnage told Thomas that the handcuffs were applied too tightly. *Id.* Thomas inserted his finger into the inner wrist space of the handcuffs to determine fit. *Id.* Harnage insisted that officers call a lieutenant. *Id.* ¶ 105. Lieutenant Cage arrived, but she would not permit officers to use another restraint system for Harnage or permit Harnage to go to his cell to retrieve his custody agreement. *Id.* ¶ 106. Cage told Harnage that if the accommodation was not in her computer, she did not have to honor it. *Id.* When Harnage told Cage that the handcuffs were digging into his wrists, Cage put her finger between Harnage's wrist and the handcuffs and told Harnage that if she could do so, the handcuffs were not too tight. *Id.* ¶ 107. Cage instructed Thomas to transport Harnage with the black-box restraints. *Id.* ¶ 108. The black-box restraints

---

[2] The Complaint does not define "face sheet."

aggravated a wrist injury for which Harnage was being seen at UConn. *Id.* ¶ 109-10.

Harnage later wrote to Daugherty, Gallagher, and Captain Grimaldi about Thomas violating the custody agreement. *Id.* ¶ 111. Harnage also spoke to Grimaldi directly, who told Harnage that he had emailed Daugherty and Gallagher about the incident with Thomas. *Id.* Grimaldi also confirmed the black-box restraint restriction and promised that the restriction would be in place for future transports. *Id.*

In May 2025, correctional officer Strauskas told Harnage that the black-box restraint restriction was not on Harnage's face sheet and informed him that, without documentation of the restriction, Harnage would be transferred to UConn's medical center using black-box restraints. *Id.* ¶ 112. Harnage pleaded with correctional officers Demartino and Bassett to call the medical unit to confirm the black-box restraint restriction. *Id.* ¶ 113. Demartino "feign[ed]" a call to the medical unit and then told Harnage that a custody agreement was not in his records. *Id.* Demartino told Harnage that there was no one else he could call and that Harnage would have to be transported with the black-box restraints. *Id.* Harnage addressed the black-box restraints with Unit Manager Haye before another transport to UConn's medical center, but the black-box restraint restriction still did not appear on Harnage's face sheet. *Id.* ¶ 114.[3]

### 2.    Use of Typewriter

As noted above, the custody agreement also "authorized Harnage's need for access to a typewriter." *Id.* ¶ 116. Harnage is known to be a "jailhouse lawyer and active litigator" whom defense attorneys have labeled a "Litigation Machine." *Id.* ¶¶ 117, 123. Harnage needed the typewriter to assist other inmates and seek "redress of his conditions of confinement." *Id.* ¶

---

[3] The Complaint does not clearly state whether Harnage ultimately visited UConn Medical on May 21, 2025. *See* Compl. ¶¶ 112-14.

118. According to the Complaint, "[i]n an admitted attempt to limit [Harnage's] access to the courts" and "limit [Harnage's] assistance to other inmates as a jailhouse lawyer," prison officials "committed to providing an extra typewriter to [Harnage's] unit," instead of "issu[ing] Harnage a typewriter to accommodate his disability." *Id*. Prison officials expected Harnage to share this extra typewriter with 96 other inmates in his housing unit. *Id.* ¶ 119. Prison officials did not permit Harnage to use the typewriter in his cell. *Id.* ¶ 120. Instead, Harnage could use the typewriter only in the dayroom during his recreational time and in the company of other inmates. *Id.* The Complaint asserts that other prisoners have been permitted to control and use typewriters outside of common areas even without a documented disability. *Id.* ¶ 121.

Prison officials also denied Harnage's request to purchase a keyboard for his tablet from the MacDougall commissary. *Id.* ¶ 127. The Complaint alleges that MacDougall's intelligence unit—described in the Complaint as the "I.U." or "intel defendants"—was responsible for this decision. *Id.* ¶¶ 128-29. The Complaint contends that members of the intelligence unit arranged to restrict his access to a personal typewriter "in retaliation for the plaintiff's legal activities challenging Intel policies and prior grievances against Intel members." *Id.* ¶ 128. The Complaint also notes that Harnage received a disciplinary report "for having extra typewriter ribbons," even though those same typewriter ribbons had been authorized and approved through a prior request for reasonable accommodation. *Id.* ¶ 145.[4]

---

[4] Harnage also describes in detail alleged acts of retaliation involving prisoner officials issuing false disciplinary reports, confiscating photographs depicting female models, rejecting orders for these photographs and religious oils, restricting content tablet usage, limiting time for recreation time and meals, locking down the population, and prohibiting the use of personal rugs. *See* Compl. ¶¶ 129-56. Because these allegations are related to claims that I will sever, I do not summarize those facts in depth here.

### B.      Procedural History

Harnage initiated this action by filing a Complaint on September 8, 2025. Compl., ECF No. 1. Harnage later filed an *ex parte* Motion for Temporary Restraining Order and Preliminary Injunction. ECF No. 9. I granted Harnage's Motion to Proceed *In Forma Pauperis* ("IFP"), ECF No. 10, and instructed Defendants to show cause why a TRO or preliminary injunction should not enter, ECF No. 11. Defendants responded in opposition to Harnage's Motion for TRO on December 12, 2025. ECF No. 33. Harnage replied in support of his Motion for TRO on February 18, 2026. ECF No. 54. I will address Harnage's eligibility for preliminary injunctive relief separately. I also take up separately several of the discovery motions that are pending in this case. *See* ECF Nos. 48, 49, 50, & 53.

## II.      <u>LEGAL STANDARD</u>

I must review prisoner civil rights complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(a)-(b). In doing so, I must assume the truth of the allegations and interpret them liberally to "raise the strongest arguments [they] suggest[]." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants). Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.    DISCUSSION

Harnage is subject to the three-strikes rule of the PLRA. I begin by explaining the operation of the PLRA's three-strikes rule before describing why Counts 23-43 of the Complaint are misjoined and can proceed only in a separate action. I then consider the sufficiency of Counts 1-22. Many of the surviving causes of action allege multiple sources of law within the same Count. For example, Count Eight alleges violation of the Eighth Amendment and the ADA. Compl. 33. In other instances, the Complaint applies the same set of operative facts to alternative legal theories. This Initial Review Order is organized based upon the source of law.

### A.    Three-Strikes Rule

"As amended by the Prison Litigation Reform Act of 1995 (PLRA), 28 U.S.C. § 1915 allows indigent prisoners to defer paying filing fees under a structured payment plan." *Chavis v. Chappius*, 618 F.3d 162, 167 (2d Cir. 2010). Yet the PLRA prohibits incarcerated plaintiffs from filing lawsuits IFP when "the prisoner has, on 3 or more prior occasions . . . brought an action . . . that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g). "But the three-strikes rule itself contains an exception: prisoners are permitted to file a lawsuit IFP - even if they have accumulated three strikes - if they are 'under imminent danger of serious physical injury.'" *Shepherd v. Annucci*, 921 F.3d 89, 94 (2d Cir. 2019) (quoting 28 U.S.C. § 1915(g)). "There must, however, be 'a nexus between the imminent danger . . . and the legal claims asserted in [the] complaint.'" *Antrobus v. New York City*, 762 F. Supp. 3d 241, 245 (E.D.N.Y. 2025) (quoting *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009)).

Harnage acknowledges he is subject to the three-strikes provision of the PLRA. Compl. ¶ 396. Harnage may proceed IFP in this action because, as explained previously, I construe the Complaint to challenge use of a black-box restraint system, which the Complaint says is "caus[ing] a gradual worsening of his injury and extreme pain and suffering to the plaintiff's dominant hand." ECF No. 10.[5]

### B.     Joinder

Because of the limits imposed by the three-strikes rule, courts often analyze whether all claims in a prisoner civil rights complaint are properly joined to the claim (or claims) that satisfy the "imminent danger" exception to the three-strikes rule. *See Webb v. Maldonaldo*, No. 3:13-CV-144 RNC, 2013 WL 3243135, at *3 (D. Conn. June 26, 2013).

The Federal Rules of Civil Procedure authorize a plaintiff to "join . . . as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). But where, as here, a plaintiff asserts claims against multiple defendants, joinder is appropriate only where the complaint asserts relief "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;" and "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A)-(B).

"Rule 21 provides that a court 'may sever any claim against a party.'" *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263 (D. Conn. 2012). In resolving whether a claim

---

[5] The Complaint appears to contend that Harnage should be entitled to proceed IFP because he faces an imminent risk of serious injury from being forced to write legal filings and complete educational assignments by hand. *See* Compl. ¶ 396(b). I need not resolve whether this injury is sufficiently serious as to also exempt Harnage from the three-strikes rule because I conclude that the allegations regarding access to a typewriter are sufficiently related to the black-box restraints that they can be brought within this same action consistent with Federal Rule of Civil Procedure 20.

should be severed for misjoinder, "[c]ourts consider whether: (1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided; and (5) different witnesses and documentary proof are required for the separate claims." *Id*. "The decision whether to sever a claim 'is committed to the sound discretion of the trial court.'" *Id*. (quoting *Greystone Cmty. Reinv. Ass'n v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 293 (D. Conn. 2009)).

As I have explained, Harnage is entitled to proceed IFP here because the Complaint supports the inference that he faces an "imminent danger of serious physical injury" from application of black-box restraints. 28 U.S.C. § 1915(g). Construed liberally, Harnage's claims of excessive force, unlawful seizure, and violation of the Equal Protection Clause (related to the use of the restraints), conditions of confinement claims (related to prison officials' reactions to the harm caused by the restraints), retaliation claims (related to seeking redress for the harm caused by the restraints), ADA and RA claims (related to the accommodations Harnage sought related to his hand injury), and access-to-courts claims (related to deficiencies in the accommodations obtained) could conceivably flow from injuries caused by the black-box restraints. I therefore conclude that those claims are properly joined to this action.

But many of Harnage's allegations and claims are not so "logically connected" to the use of black-box restraints. Harnage's other claims relate to prison officials' confiscation of "commercially produced photographs of female models," Compl. ¶ 305; prison officials' refusal to allow Harnage to make confidential calls to stenographers, *id.* ¶ 368; "cell lockout[s]," *id.* ¶ 377; and possession of personal rugs, *id.* ¶ 383. These claims "arise from different circumstances and would require separate analyses," *Costello*, 888 F. Supp. 2d at

264, and thus are not "so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).[6] Nor is there "'substantial' overlap in questions of law or fact across the claims," *Ardolf v. Weber*, 332 F.R.D. 467, 479 (S.D.N.Y. 2019), such that the claims involve a "question of law or fact common to all defendants," Fed. R. Civ. P. 20(a)(2).

Accordingly, I will consider the merits of Counts 1-22 and sever and dismiss the remainder of the claims (Counts 23 through 43) pursuant to Rule 21. *See Jordan v. Dep't of Corr.*, No. 3:24CV227 (VAB), 2024 WL 5112001, at *2 (D. Conn. Dec. 13, 2024) (severing and dismissing misjoined claims while permitting properly joined claims to proceed). For this reason, Counts 23 through 43 are dismissed without prejudice.

### C.    Eighth Amendment Excessive Force Claims (Counts 1, 3, 8, 13)

Harnage contends that Defendants imposed excessive force in the form of black-box restraints in violation of the Eighth Amendment. *See* Compl. ¶¶ 189-93, 201-04, 223-25, 246-51. An Eighth Amendment excessive force claim comprises both an objective and subjective component. *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000). "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1084 (2d Cir. 2021) (quoting *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019)).

To satisfy the objective component, an incarcerated plaintiff "must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional

---

[6] Although *Harris* arose in the context of Rule 13(a), which applies to compulsory counterclaims, "[i]n construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance from the use of the same term in Rule 13(a)." *Barnhart v. Town of Parma*, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (collecting cases).

dimensions." *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016) (quoting *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015)). "Although not 'every malevolent touch by a prison guard gives rise to a federal cause of action,' the Eighth Amendment is offended by conduct that is 'repugnant to the conscience of mankind.'" *Crawford*, 796 F.3d at 256 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). "Actions are repugnant to the conscience of mankind if they are 'incompatible with evolving standards of decency' or involve 'the unnecessary and wanton infliction of pain.'" *Id.* (quoting *Hudson*, 503 U.S. at 10); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (stating that the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures") (citation and internal quotation marks omitted).

"To meet the subjective element, a plaintiff must show that the prison officials had 'a state of mind that is the equivalent of criminal recklessness.'" *Matzell v. Annucci*, 64 F.4th 425, 435 (2d Cir. 2023) (quoting *Francis*, 942 F.3d at 150). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris*, 818 F.3d at 63 (citation and internal quotation marks omitted). "For excessive force claims, as contrasted with other actions or inactions that rise to the level of Eighth Amendment violations, the test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). "To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the

12

threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Id.* (quoting *Scott*, 344 F.3d at 291).

Here, Harnage suffered an "extreme hyperextension of his injury affecting the use of his dominant hand." Compl. ¶ 94. This "nontrivial" injury is sufficient to satisfy the objective component. *Wilkins*, 559 U.S. at 39. At this stage, Harnage's allegations are also sufficient to satisfy the subjective component. "The Second Circuit has recognized that the application of excessively tight handcuffs or restraints 'in excess of what was necessary under the circumstances' may rise to the level of a constitutional excessive force violation." *Mason v. Connecticut Dep't of Correction*, No. 3:21-CV-1088 (MPS), 2022 WL 19341, at *5 (D. Conn. Jan. 3, 2022) (quoting *Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir. 1994)); *accord Mitchell v. Maldonado*, No. 3:25-CV-253 (KAD), 2025 WL 2098141, at *5 (D. Conn. July 25, 2025). The Complaint posits that Defendants could have secured prisoners using a "CTU setup," which would have imposed "less stress in the force applied at the wrists." Compl. ¶¶ 76-78. These allegations suffice for purposes of initial review to state a claim of excessive force in violation of the Eighth Amendment.

However, Harnage may not pursue damages on his excessive force claim against all Defendants. Harnage seeks damages against Defendants in their official and individual capacities. *See* Compl. ¶¶ 8-43, 394. To the extent Harnage asserts official capacity claims for monetary damages against Defendants (all state employees), such claims are dismissed as barred by state sovereign immunity. *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985). To the extent Harnage seeks damages from any defendant in their individual capacity, he must allege facts establishing the personal involvement of each defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

13

"The Second Circuit has defined 'personal involvement' to mean direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" *Rivera v. Viger*, No. 3:21-cv-00470 (VAB), 2021 WL 3269095, at \*3 (D. Conn. July 30, 2021) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). When a defendant is a supervisory official, as many are here, "a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). A plaintiff may not sue a defendant for a constitutional violation committed by another defendant solely based on his or her "high position of authority in the prison system." *Wright*, 21 F.3d at 501.

Not all Defendants were personally involved in using excessive force against Harnage. Harnage asserts that he "informed each of the defendants, both verbally and in writing, that the use of the black-box on him for transport or other purposes[] causes an extreme [e]ffect and degradation of his injury." Compl. ¶ 61. But "[a]s a corollary of the personal involvement requirement, complaints that rely on 'group pleading' and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Gonzalez v. Yepes*, No. 3:19-CV-00267 (CSH), 2019 WL 2603533, at \*7 (D. Conn. June 25, 2019) (internal quotation marks omitted) (collecting cases). As such, Harnage cannot maintain a claim against a Defendant based only on an allegation that he told the Defendant that the black-box restraints were injuring him. *See, e.g.*, *Foster v. Connecticut*, No. 3:24-CV-773 (JAM), 2024 WL 4528874, at \*3 (D. Conn. Oct. 18, 2024). I will therefore dismiss Harnage's

14

excessive force claim against any Defendant who did not actually impose or have some role in addressing the impact of the black-box restraints on Harnage.

Nonetheless, the Complaint does allege facts that support the inference that Decateau, Thomas, Strauskas, Robledo, Griffin, Cage, and Demartino were personally involved in the alleged violations of Harnage's right to be free from excessive force. Decateau personally applied the black-box restraints to Harnage despite Harnage's "protestations" in January 2023. Compl. ¶¶ 79, 88. Thomas and Strauskas later did the same in June 2024 and May 2025, respectively. *Id.* ¶¶ 96, 112. These defendants "personal[ly] participat[ed]" in the allegedly unconstitutional conduct, so Harnage may claim damages from them. *See Rivera*, 2021 WL 3269095, at *3. And although it does not appear that they actually applied black-box restraints, Robledo, Griffin, and Cage insisted that Harnage be transported with the black-box restraints in June 2024. Compl. ¶ 104. Demartino did the same in May 2025. *Id.* ¶ 113. Because these officers "help[ed] others to do the unlawful acts," *Rivera*, 2021 WL 3269095, at *3, Harnage may also pursue damages against Robledo, Griffin, Cage, and Demartino.

The remainder of the defendants mentioned in connection with this claim were supervisors. After Harnage returned to the prison with Decateau in January 2023, Harnage submitted an ADA request. Compl. ¶ 73. Harnage asserts that Gallagher and Daugherty approved his ADA request in March 2023 and promulgated a "custody agreement" containing accommodations. Compl. ¶¶ 73-74. Harnage also asserts that Grimaldi confirmed the black-box restriction remained in place and promised that the restriction would be in place for future transports after Harnage complained. *Id.* ¶ 111. These actions are sufficient to state a claim against Gallagher, Daugherty, and Grimaldi. *See Bourgoin v. Weir*, No. 3:10-CV-391 (JBA), 2011 WL 4435695, at *5-6 (D. Conn. Sept. 23, 2011) (noting that a deputy warden "may be

15

liable . . . for failure to remedy a wrong after being informed through a report or appeal, where he or she acts or responds in an inadequate fashion to a prisoner's letter of protest or request") (internal quotation marks omitted).

Harnage also claims damages from Haye, the "new unit manager." Compl. ¶¶ 17, 114. The facts alleged as to Haye are sparse: the Complaint alleges that after Harnage complained to Haye (along with other unnamed defendants) that his "face sheet" did not include the black-box restriction, the face sheet continued to omit the black-box restriction. *Id.* ¶ 114. I exercise my discretion to conclude for purposes of initial review that Harnage may proceed on the claim against Haye for further development of the record.

For these reasons, Harnage may proceed on his Eighth Amendment excessive force claim for damages from Decateau, Thomas, Strauskas, Robledo, Griffin, Cage, and Demartino and supervisors Gallagher, Daugherty, Haye, and Grimaldi.

### D.    Eighth Amendment Conditions of Confinement Claims (Counts 6, 9, 11, 12, 15, 16, 17, 18)

Harnage also brings claims under the Eighth Amendment related to his conditions of confinement.[7] Compl. ¶¶ 215-17, 227-29, 235-40, 242-44, 260-65, 267-69, 271-75, 277-81. To state a claim under the Eighth Amendment related to conditions of confinement, a plaintiff must allege facts showing that: (1) he was confined under conditions that posed a substantial risk of serious harm; and (2) the prison official both knew that the plaintiff faced a substantial

---

[7] Although this claim relies upon many of the same operative facts as those involved in the excessive force claims, I analyze the two Eighth Amendment claims separately. *See Suarez*, 170 F.4th at 59 ("Although they are necessarily factually intertwined, we evaluate Suarez's two Eighth Amendment claims—based on conditions of confinement and inadequate medical care—separately."); *Reshard v. City of New York*, No. 24-CV-2531 (MKV), 2026 WL 550007, at *2-5 (S.D.N.Y. Feb. 27, 2026) (engaging in separate analyses for conditions of confinement and excessive force claims rooted in same operative facts).

risk of serious harm and failed to take reasonable actions to abate or avert the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Determining a substantial risk of harm depends on the context of the alleged violation. *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019). The question is thus "whether prison officials, acting with deliberate indifference, exposed a prisoner to a 'sufficiently substantial risk of serious damage to his future health.'" *Farmer*, 511 U.S. at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). As to the subjective component of the claim, "[a]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (internal quotation marks and citations omitted). A plaintiff must show more than mere negligence. *Id.* at 106. Rather, the prison official must have acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "It is well-settled that one may disregard a risk – and thus be deliberately indifferent to it – through either action *or* inaction." *Suarez v. Morton*, 170 F.4th 33, 60 (2d Cir. 2026). "Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 842); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.").

Harnage has satisfied the objective component by alleging that the black-box restraints aggravated a long-standing wrist injury. *See Mitchell*, 2025 WL 2098141, at *6 (concluding that plaintiff's allegations that "(1) he was handcuffed from behind for at least three hours; (2) he complained of his hands turning purple and being in pain; (3) was treated with medication and ice packs daily for approximately one week after being handcuffed; and (4) and his back injuries were exacerbated as a result of being handcuffed from behind for three hours" were sufficient to establish objective component).

Harnage has also satisfied the subjective component by alleging that correctional officers applied black-box restraints even after he told officers that the restraints were too tight. *See*, *e.g.*, Compl. ¶¶ 80, 104; *see also Mitchell*, 2025 WL 2098141, at *6 (plaintiff's allegation that "notwithstanding his visible pain and injuries, [lieutenant] ordered [plaintiff] to remain handcuffed from behind in the dayroom for an extended period of time" satisfied subjective component). Because Harnage has alleged facts satisfying both components, these claims may proceed. But, as with Harnage's excessive force claims, the conditions of confinement claims may proceed only against the Defendants whom the Complaint plausibly alleges were personally involved in the alleged constitutional violations. Because these claims are "necessarily factually intertwined," *see Suarez*, 170 F.4th at 59, I will exercise my discretion to permit Harnage to proceed against the same Defendants identified whom I have concluded are potentially liable for the excessive force claims. The Eighth Amendment conditions of confinement claim may therefore proceed against Defendants Decateau, Thomas, Strasuskas, Robledo, Griffin, Cage, Demartino, and supervisors Gallagher, Daugherty, Haye, and Grimaldi.

### E.    Fourth Amendment Seizure Claims (Counts 2, 4, 10, 14)

Harnage also maintains that prison officials unlawfully seized him by using the black-box restraints in violation of the Fourth Amendment. Compl. ¶¶ 195-99, 206-09, 231-33, 253-58. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. But the Supreme Court has made clear that, with respect to sentenced prisoners, "the Eighth Amendment serves as the primary source of substantive protection in cases where the deliberate use of force is challenged as excessive and unjustified." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citation and internal quotation marks omitted). For this reason, "the constitutionality of the use of force by prison officials against a sentenced prisoner is governed by the Eighth Amendment rather than the Fourth Amendment." *Raynor v. Maldonado*, No. 3:24-CV-1221 (JAM), 2024 WL 4533748, at *6 (D. Conn. Oct. 21, 2024); *accord Bonilla v. Jaronczyk*, 354 F. App'x 579, 581 (2d Cir. 2009) (summary order). Because Harnage's claims are properly analyzed under the Eighth Amendment rather than the Fourth Amendment, I will dismiss his Fourth Amendment claim for failure to state a claim. 28 U.S.C. § 1915A(b)(1).

### F.    Fourteenth Amendment Equal Protection Claim (Count 7)

I next consider Harnage's equal protection claim. Compl. ¶¶ 219-21. Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Complaint alleges that Defendants violated the Equal Protection Clause by imposing a more restrictive means of restraint than used upon "other inmates within the state." Compl. ¶ 221.

I construe Harnage to raise a class-of-one claim because the Complaint challenges the way that he was treated as compared to other sentenced prisoners in Connecticut. Compl. ¶¶

19

220-21. Harnage may bring a "class of one" equal protection claim if the Complaint plausibly alleges "that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). In the Second Circuit, a class-of-one plaintiff "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). In particular, "a plaintiff must establish that he and a comparator are *prima facie* identical by showing that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (citation and internal quotation marks omitted).

"Courts in the Second Circuit routinely dismiss class-of-one equal protection claims where a plaintiff is unable to identify in their pleadings a similarly-situated comparator." *Crenshaw v. Dep't of Corr.*, No. 24-CV-439 (SFR), 2025 WL 2776975, at *5 (D. Conn. Sept. 25, 2025). Here, the Complaint does not allege that Harnage was treated differently than other individuals at MacDougall. *See* Compl. ¶ 219. Nor does the fact that Harnage was treated differently than people held at other state prisons support an inference of improper disparate treatment. *See Gardner v. Harry*, No. 1:22-CV-1007, 2023 WL 4166091, at *3 (M.D. Pa. June 23, 2023) (collecting cases in support of the proposition that "[i]nmates housed in different prisons with different housing and security needs are not similarly situated to one another"). I

therefore dismiss Harnage's equal protection claim for failure to state a claim. 28 U.S.C. § 1915A(b)(1).

### G.    First Amendment Retaliation Claim (Count 21)

Harnage also brings a First Amendment retaliation claim. Compl. ¶¶ 293-95. The Complaint notes that Defendants "granted Harnage access to a typewriter" as an ADA accommodation. *Id.* ¶ 293. In response to Harnage's grievances (which I assume to relate to the black-box restraints), the Complaint alleges that Defendants retaliated against him by restricting his access to the typewriter. *Id.* ¶ 294.

To prevail on a First Amendment retaliation claim, a plaintiff must show "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). "Courts must approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025) (citation and internal quotation marks omitted). Accordingly, courts require "prisoner retaliation claims [to] be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Id.* at 299 (internal quotation marks omitted).

The first requirement is clearly satisfied because it is well established that "the filing of a lawsuit or a grievance is protected conduct." *Walker*, 130 F.4th at 298. As to the second requirement, Harnage appears to contend that he experienced an adverse action insofar as

Defendants prevented him from using a typewriter. Although it is not clear from the current record how exactly Defendants blocked Harnage from using a typewriter, I assume for purposes of this analysis that Harnage might be able to satisfy the adverse action requirement. Nonetheless, I dismiss the retaliation claim because the Complaint does not support the inference that any adverse action was actually caused by Harnage's protected speech or expression.

"[T]o satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* (internal quotation marks omitted). *Walker*, 130 F.4th at 298. "[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004). The Complaint alleges upon information and belief that the intelligence unit at MacDougall orchestrated to prevent Harnage from purchasing a keyboard. Compl. ¶¶ 127-28. Beyond this conclusory allegation, the Complaint does not describe when Harnage first received access to a typewriter, state how his access to a typewriter changed, or offer any other explanation to connect Harnage's protected activities with his difficulties accessing a typewriter or related accessories. Nor does the Complaint include non-conclusory allegations to suggest that any of the named Defendants knew about Harnage's protected activities and participated in the decision to restrict his access to a typewriter.

Accordingly, Harnage's First Amendment retaliation claim is dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1).

### H.    Access-to-Courts Claims (Counts 20, 22)

I next consider Harnage's access-to-courts claims related to the typewriter and tablet keyboard. Compl. ¶¶ 289-91, 297-300. "[T]he Supreme Court has long recognized that prisoners have a right to meaningful access to the courts and that prison officials are barred from actively interfering with inmates' attempts to prepare legal documents." *Kaminski v. Semple*, 796 F. App'x 36, 38-39 (2d Cir. 2019) (summary order) (internal quotation marks omitted) (quoting *Lewis v. Casey*, 518 U.S. 343, 350 (1996) (citing *Bounds v. Smith*, 430 U.S. 817 (1977))). "The Supreme Court has grounded the right of access to courts in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses." *Dixon v. Lupis*, No. 3:20CV1754 (VLB), 2021 WL 4391246, at *9 n.2 (D. Conn. Sept. 24, 2021) (cleaned up) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002)).

To state an access-to-courts claim, "a prisoner must show that: (1) he suffered an actual injury, . . . (2) to a non-frivolous legal claim, (3) concerning his criminal conviction, habeas corpus petition, or conditions of confinement." *Kaminski*, 796 F. App'x at 39 (quoting *Lewis v. Casey*, 518 U.S. 343, 350 (1996)). "Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher*, 536 U.S. at 414-15. Accordingly, "[t]he underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant" and must be "described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 416.

23

Because Harnage makes no attempt to describe his legal claim well enough for me to determine whether it is frivolous, arguable, or "more than hope," *Christopher*, 536 U.S. at 416, the first and second requirements of this claim remain unsatisfied. *See Mitchell v. Martin*, No. 3:23-CV-902 (JAM), 2023 WL 8114344, at *4 (D. Conn. Nov. 22, 2023) (dismissing access-to-courts claim because complaint "d[id] not describe by name or with any precision any past or present legal claim or defense that has been thwarted by any of the defendants' actions" or "establish that any such actions are or were arguably meritorious and not frivolous"). Accordingly, Harnage's access-to-courts claims must be dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1).

## I.    ADA and RA Claims (Counts 5, 18, 19, and 22)

Finally, Harnage brings claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). *See* Compl. ¶¶ 211-13, 283-87. Count Five contends that Defendants violated the ADA and RA when they applied the black-box restraint system even after Harnage informed Defendants that his recognized disability would be aggravated by this restraint. *Id.* ¶ 211. Count 18 alleges that Defendants violated the ADA by imposing additional restrictions on Harnage's use of a typewriter such that the typewriter accommodation was no longer reasonably accessible to Harnage. *Id.* ¶¶ 277-81. Count 19 submits that Defendants injured Harnage in violation of the ADA and RA (as well as the Eighth Amendment) by depriving him of access to a typewriter, which they knew or should have known would aggravate the injury to his hand. *Id.* ¶¶ 284-87. And Count 22 challenges Defendants' decision to decline Harnage's request to purchase a keyboard for his prison tablet. *Id.* ¶¶ 297-302.

"The only difference between the ADA and RA is that the RA applies to entities receiving federal financial assistance while Title II of the ADA applies to all public entities, a distinction not relevant here." *Jones v. Baran*, No. 3:23-CV-1039 (VDO), 2025 WL 2910278, at *14 n.97 (D. Conn. Aug. 4, 2025). "Because the standards under both statutes are the same, courts treat claims under the ADA and RA identically." *Laboy v. Beaulieu*, 3:18-CV-361 (KAD), 2019 WL 2076810, at *2 (D. Conn. May 10, 2019) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

To state a claim under Title II of the ADA, Harnage "must show that 1) he is a qualified individual with a disability; 2) [DOC] is an entity subject to the [ADA]; and 3) he was denied the opportunity to participate in or benefit from [DOC's] services, programs, or activities or [DOC] otherwise discriminated against him by reason of his disability." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks omitted). I construe Harnage to advance only claims that Defendants failed to make reasonable accommodations. *See* Compl. ¶ 213 (stating that defendants "fail[ed] and refus[ed] to utilize a readily available alternative restraint system, as a reasonable accommodation, after being informed of the plaintiff's qualified disability").

I assume for purposes of initial review that Harnage is a qualified individual with a disability and DOC is subject to the ADA. *See* 42 U.S.C. § 12102(1) (defining physical disability); *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998) (holding that the ADA "unmistakably includes State prisons and prisoners within its coverage"). I also

25

conclude—for purposes of initial review—that the Complaint supports the inference that Defendants failed to make a reasonable accommodation for Harnage's disability.

When evaluating a reasonable accommodation claim, a court asks "whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled." *Wright*, 831 F.3d at 72 (internal quotation marks omitted). "Services, programs, or activities" include "recreational 'activities,' medical 'services,' and educational and vocational 'programs.'" *Yeskey*, 524 U.S. at 210. "A plaintiff need not demonstrate that [he] is entirely precluded from accessing a benefit; rather, difficulty in accessing a benefit is sufficient to sustain a reasonable accommodation claim." *Goode v. Salias*, No. 3:24-CV-1010, 2024 WL 3718268, at *7 (D. Conn. Aug. 8, 2024) (internal quotation marks omitted).

Harnage is clearly entitled to access specialist medical appointments at outside providers. *Yeskey*, 524 U.S. at 210-11. The Complaint plausibly alleges that black-box restraints served as an unreasonable impediment to Harnage accessing outside medical appointments insofar as the restraints caused additional pain and suffering in transferring Harnage to outside medical appointments. *See, e.g.*, *Nesbitt v. Williams*, No. 13 C 9241, 2017 WL 1079240, at *3 (N.D. Ill. Mar. 21, 2017) (concluding that incarcerated plaintiff stated claim under ADA and RA because the "pain [plaintiff] suffers when he travels in order to access medical treatment" was caused by defendants' "refus[al] to accommodate his physical condition by using medical restraints instead of black box restraints"). Although Defendants Gallagher and Daugherty *approved* Harnage's request for an accommodation, the Complaint suggests that this accommodation was never communicated to prison staff or properly entered into Harnage's records. Compl. ¶ 75. Ineffective accommodations are not considered

"reasonable." *See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable accommodation is effectiveness."); *Wright*, 831 F.3d at 74 (concluding that mobility assistance program was ineffective and thus failed to provide a reasonable accommodation). I therefore conclude that Count Five may proceed.

Counts 18 and 19 contend that Defendants imposed additional restrictions that prevented Harnage from accessing a typewriter, which he required to participate in prison educational programs and other services. Because the Complaint plausibly alleges that Defendants' actions meant that the typewriter accommodation was no longer an effective means for Harnage to participate in rehabilitative or educational services, I will permit both Counts to proceed to service.

In Count 22, however, Harnage challenges Defendants' decision to deny his request to purchase a tablet keyboard. Compl. ¶¶ 297-302.[8] Harnage sought permission to purchase a tablet keyboard "to facilitate [his] access to the state Tablet Program." *Id.* ¶ 297. Although the Complaint contends that Harnage's treatment provider supports Harnage using a keyboard, *id.* ¶ 299, the Complaint does not describe why Harnage's disability prevents him from using the prison tablet as currently configured. For this reason, Count 22 is dismissed with leave to amend.

---

[8] Although this Count is brought under every cause of action set forth elsewhere in the Complaint, I construe Count 22 to seek relief only under the ADA and RA because it is premised upon Harnage's efforts to participate in educational programming on his prison-provided tablet. To the extent Harnage asserts that Defendants violated the Eighth Amendment or the Equal Protection Clause by denying his requests to purchase a tablet keyboard, such a claim is dismissed without prejudice for failure to state a claim.

27

Furthermore, Harnage "may not bring a claim pursuant to Title II of the ADA against a state actor in her individual capacity." *Lenti v. Connecticut*, No. 3:20-CV-127 (SRU), 2020 WL 4275600, at *7 (D. Conn. July 24, 2020) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir. 2001)). Accordingly, any individual capacity ADA or RA claim must be dismissed. *See id.* (dismissing individual capacity ADA claim). However, "[u]nder certain circumstances, an inmate may assert a Title II ADA claim for money damages against a state actor in her official capacity." *Id.* And Harnage "may assert a Title II ADA claim against a state actor in her official capacity for prospective injunctive relief." *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," *Graham*, 473 U.S. at 166, I will permit Harnage to proceed with a claim for damages and prospective injunctive relief against the defendants who may be sued in connection with other claims (Decateau, Thomas, Strauskas, Robledo, Griffin, Cage, Demartino, Gallagher, Daugherty, Haye, and Grimaldi) in their official capacities.

## IV.    CONCLUSION AND ORDERS

Consistent with the foregoing, I enter the following orders:

(1) Harnage's Eighth Amendment claim excessive force related to the black-box restraints may **PROCEED** against Decateau, Thomas, Strauskas, Robledo, Griffin, Cage, Demartine, Gallagher, Daugherty, Haye, and Grimaldi in their individual capacities.

(2) Harnage's Eighth Amendment conditions of confinement claim related to imposition of the black-box restraints may **PROCEED** against Decateau, Thomas, Strauskas,

28

Robledo, Griffin, Cage, Demartino, Gallagher, Daugherty, Haye, and Grimaldi in their individual capacities.

(3) Harnage's ADA and RA claims related to imposition of the black-box restraints in contravention of Harnage's accommodation and denial of access to a typewriter may **PROCEED** against Decateau, Thomas, Strauskas, Robledo, Griffin, Cage, Demartino, Gallagher, Daugherty, Haye, and Grimaldi in their official capacities.

(4) All other claims are **DISMISSED WITHOUT PREJUDICE**, 28 U.S.C. § 1915A(b)(1), and all other defendants are terminated.

**(5) Harnage has two options as to how to proceed in response to this Initial Review Order:**

If Harnage wishes to proceed immediately **only** on the claims and the Defendants identified in paragraphs (1) – (3), he may do so without further delay. If Harnage selects this option, he shall file a notice on the docket on or before **June 30, 2026,** informing the court that he elects to proceed with service as to the claims identified above. The court will then begin the effort to serve process in the capacity described above.

Alternatively, if Harnage wishes to attempt to replead any of the claims asserted in his complaint that have been dismissed in order to attempt to state a viable claim, he may file an amended complaint on or before **June 30, 2026**. An amended complaint, if filed, will completely replace the complaint, and the court will not consider any allegations made in the original complaint in evaluating any amended complaint. The court will review any amended complaint after filing to determine whether it may proceed to service of process on any defendants named therein. If Harnage elects to file an amended complaint, the complaint addressed by this Initial Review Order will **not** proceed to service of process on any defendant.

29

If the court receives no response from Harnage on or before **June 30, 2026**, the court will presume that Harnage wishes to proceed on the complaint as to the claims permitted to go forward in this Initial Review Order, and Harnage will have to show good cause if he seeks to amend the complaint in any manner in the future. Fed. R. Civ. P. 16(b)(4).

(6) If Harnage changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he **MUST** notify the court. Failure to do so can result in the dismissal of the case. Harnage must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. Because Harnage has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify Defendants or defense counsel of his new address.

(7) While incarcerated, Harnage shall use the Prisoner Electronic Filing Program when filing documents with the court. Harnage is advised that the Program may be used only to file documents with the court. Local rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R 5(f). Therefore, discovery requests must be served on Defendant's counsel by regular mail.

**SO ORDERED.**

New Haven, Connecticut
May 27, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge